IN THE CIRCUIT COURT

OF THE ELEVENTH JUDICIAL CIRCUIT

FORD COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS,)
                                )
VS.                             )NO. 04CF120
                                )NO. 05CF
MARSHALL BLANCHARD,             )
          Defendant.            )

          Probable Cause hearing held on March 10th,
2005, in the above cause before the HONORABLE STEPHEN
PACEY, in Ford County, Paxton, Illinois.

APPEARANCES

Mr. Anthony Lee, State's Attorney, on behalf of the
People.

Mr. Robert Kirchner, Attorney at Law, on behalf of the
Defendant.

Deborah L. Izatt, CSR
License No. 084-002429

Exhibit 16

1

2    WITNESS:

3    Randy Kinzinger       1-4?

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1          THE COURT:   This is Matter, Case No. xx-xxxx
 2    versus Marshall Blanchard, B-L-A-N-C-H-A-R-D.  Mr. Lee
 3    for the State and Mr. Kirchner with the Defendant.
 4    These matters are coming on for a Preliminary Hearing.
 5    The cases are heard for purposes of the Preliminary
 6    Hearing together.  They have not been consolidated.
 7    Mr. Lee, when you present evidence, will you clarify
 8    which date you are talking about?  All parties ready to
 9    proceed?
10          MR. LEE:  State is ready.
11          THE COURT:  Your first witness.
12          MR. KIRCHNER:  Your Honor, I would ask the
13    witnesses be excluded.
14          THE COURT:  All right.  Have you more than one
15    witness?
16          MR. LEE:  No, I have one witness.  People call
17    Randy Kinzinger.
18
19                    RANDY KINZINGER
20      called as a witness on behalf of the People, after
21    having been first duly sworn, was examined and testified
22                      as follows:
23
24
```

DIRECT EXAMINATION

BY MR. LEE:

Q. Will you state your name for the record?

A. Randy Kinzinger.

Q. What's your occupation?

A. Chief of Police, Village of Roberts.

Q. How long you been in law enforcement?

A. Twelve, 13 years.

Q. Are you familiar with the Defendant in this case, Marshall Lee Blanchard?

A. Yes, I am.

Q. Is he here in this courtroom today?

A. Yes, he is.

Q. Please identify his location and an article of clothing he is wearing.

A. He is at the defense table in the stripped shirt.

THE COURT: Let the record reflect he identified the Defendant.

Q. Officer, will you tap on that microphone? Officer, I draw your attention back to December the 29th of last year, around 6 o'clock. Did you have occasion to receive a call from Lori Blanchard?

1    A.   Yes, sir.

2    Q.   How long have you known Lori Blanchard?

3    A.   8 years.

4    Q.   How was Lori Blanchard related to Marshall Lee

5  Blanchard?

6    A.   Ex-wife.

7    Q.   And did you have occasion to meet with her?

8    A.   Yes, sir.

9    Q.   Okay.  Did you obtain some information from her

10  at that meeting?

11    A.   Yes, I did.

12    Q.   Could you summarize for the Court the

13  information you obtained from her?

14    A.   She brought photographs out.  Well, she brought

15  a floppy disk out that printed photographs, and she

16  brought a sample pack of white powdery substance.

17    Q.   What did the photographs depict?

18    A.   The photographs depicted some plastic bottles,

19  and they had what appeared to be a off-white powdery

20  substance in them.

21    Q.   Who was, who is Marshall Blanchard, Jr.?

22    A.   That is Marshall and Lori's son.

23    Q.   And what information did Lori provide you from

24  Marshall Blanchard, Jr.?

1    A.  The statue.

2        MR. KIRCHNER:  Objection at this point.  She

3    stated, I realize hearsay is admissible in a Preliminary

4    Hearing, but apparently now we are talking about not

5    only one level but two levels of hearsay, and we have no

6    foundation as to when Lori Blanchard might have received

7    any information from Marshall Blanchard, Jr.  Apparently

8    he is going to repeat some statements.

9        THE COURT:  We are going to find that out;

10   overruled.

11       A.  Could you repeat the question please?

12       Q.  What information did Marshall Blanchard, Jr.,

13   provide her?

14       A.  He had called her earlier that afternoon and

15   stated that things didn't look right.  There was a very

16   strong odor of chemical.

17       MR. KIRCHNER:  Same objection.

18       THE COURT:  Same ruling.

19       A.  Strong odor of chemical in the house, and he

20   took some photographs and met her after work at her

21   residence and gave her the floppy disk and a sample of

22   the powder he had taken.

23       Q.  Those are photographs you previously described,

24   correct?

1    A.    Repeat your question.

2    Q.    Those are the photographs you previously

3    described?

4    A.    Yes, sir.

5    Q.    What was done with the substance?

6    A.    The substance I contacted Ford County

7    Sherriff's Office and Lieutenant Miller to bring a test

8    kit.  He was busy, and he sent Deputy Stack.  Deputy

9    Stack came and tested the substance.

10    Q.    What was the result of the test?

11            MR. KIRCHNER:   Objection.

12    A.    What's your objection?

13            MR. KIRCHNER:   Same objection.  Judge, we don't

14    have any information about when, where, how this

15    substance was allegedly obtained.  All he is going to do

16    is testify to some apparent field test result.

17            THE COURT:   Okay.  There may not be probable

18    cause.  Overruled.

19    Q.    What was the result?

20    A.    The result showed a positive indication for

21    Ephedrine.

22    Q.    After that, did you have occasion to Petition

23    for a search warrant?

24    A.    Yes, sir.

1       Q.   In fact, that was that same evening --
2    December evening of December 29; is that correct?
3       A.   Yes, sir.
4       Q.   And did you, in fact, obtain a search warrant;
5    is that correct?
6       A.   Yes, sir.
7       Q.   You did contact members of the Illinois State
8    Police; is that correct?
9       A.   Yes, yes, sir.
10      Q.   And a TASC response team was assembled the
11   following morning; is that correct?
12      A.   Yes.
13      Q.   That was headed up by Investigator Darrel
14   Aders; is that correct?
15      A.   Yes, sir.
16      Q.   Approximately, 1:30 the warrant was executed;
17   is that correct?
18      A.   Yes, sir.
19      Q.   That is at Marshall Blanchard's residence in
20   Roberts; correct?
21           MR. KIRCHNER:  Objection.  Foundation.
22           THE COURT:  What are you talking about time or
23   I think I heard the place?  What's the foundational
24   objection?

```
 1              MR. KIRCHNER:  There is     that a

 2   foundation with respect to the apparent forthcoming

 3   answer regarding the location.

 4              THE COURT:  Well, overruled.  We will see what,

 5   whether there is or is not a foundation.

 6              (BY MR. LEE:)

 7     Q.  Where was the search warrant executed?

 8     A.  At Marshall Blanchard's residence in Roberts,

 9   215 North Main.

10              MR. KIRCHNER:  Same objection.  Move to strike.

11              THE COURT:  Overruled.

12              (BY MR. LEE:)

13     Q.  And that was the location specified in the

14   search warrant; is that correct?

15     A.  Yes, sir.

16     Q.  Okay.  What happened?

17     A.  Rephrase your question please.

18     Q.  What happened in the course of executing the

19   search warrant?

20     A.  The Illinois State Police TRT Team executed the

21   warrant, secured the residence, at which time Cynthia

22   Blanding was outside the residence.  She was put on the

23   ground and taken into custody, and after they secured

24   the residence, they came out and secured the whole
```

premises that a Tad Fist from DATACH, a Task

Force went in, and they conducted the search, and they

bagged and tagged all the evidence and brought it out to

me.

    Q.  Okay.  At some point, was some evidence

tendered to you?

    A.  Yes.

    Q.  Could you summarize some of the items of

evidence that was tendered to you?

    A.  There was a needle, containing of liquid.

There was coffee filters.  There was a bottle with a red

liquidity substance in it.  There was a methamphetamine

container.

    MR. KIRCHNER:  Objection.  Move to strike.  No

foundation.

    THE COURT:  Overruled.

    A.  There was weapons that were brought out to me.

Those are some of the things I can remember offhand.

    Q.  Were certain of these items ultimately

forwarded or delivered by you to the Illinois State

Police Crime Lab?

    A.  Yes, sir.

    Q.  And you have, have you gotten at least one lab

report back from the State Police; is that correct

1        A.  Yes, sir.

2        Q.  And was the result of that lab report an

3   indication of a substance containing methamphetamine in

4   access of more than 15 grams but not more than a hundred

5   grams?

6        A.  Yes, sir.

7        Q.  And that was one of the items found there at

8   the Defendant's house; is that correct?

9        A.  Yes, sir.

10        MR. KIRCHNER:  Same objection.

11        THE COURT:  Same ruling.

12        Q.  Were items found in the course of executing the

13   search warrant consistent with, with the manufacture of

14   the methamphetamine?

15        MR. KIRCHNER:  Objection, foundation.

16        THE COURT:  All right.  How does he know?

17   Sustained.

18        Q.  What training and experience do you have with

19   respect to methamphetamine labs?

20        A.  Our Fire Department put on a class on

21   manufacturing of methamphetamine for the knowledge of

22   the firemen to know what they were looking at when they

23   would go into a residence.  So they won't get into

24   something that was hazardous.

1          Q.   Based upon that, what did you mean ... ... ... that
2    was reported to you consistent with the manufacture of
3    methamphetamine?
4          MR. KIRCHNER:  Same objection.
5          THE COURT:  As to foundation.
6          MR. KIRCHNER:  Yes.
7          THE COURT:  Overruled.
8          MR. LEE:  Yes.
9          Q.   Is Marshall Blanchard a convicted felony?
10         A.   Yes.
11         MR. KIRCHNER:  Objection.  Relevancy.
12         MR. LEE:  One of the charges is a Class 3
13   felony unlawful possession of weapons by a felon; Count
14   3.
15         THE COURT:  Okay.  Overruled.
16         A.   Yes.
17         MR. LEE:  He has a felony conviction out of
18   Will County; is that correct?
19         A.   I can --
20         MR. KIRCHNER:  Okay.  Foundation.
21         THE COURT:  Overruled.
22         A.   I can state he has a felony conviction.
23         Q.   Approximately, how many firearms were obtained
24   from the residence?

1    A.  7, 8, 9 something like that.

2    Q.  Who are those weapons now in the possession of?

3    A.  ATF.

4    Q.  You previously described the result of the

5    field test that was a positive test for Ephedrine; is

6    that correct?

7    A.  Yes, sir.

8    Q.  Is that a precursor of the manufacture of

9    methamphetamine?

10          MR. KIRCHNER:  Objection, leading.

11          THE COURT:  Sustained.  What's the foundation?

12    Q.  In the course of your training and experience

13    and specific training you just mentioned, did that

14    course cover precursor or ingredients for the production

15    of methamphetamine?

16    A.  Yes, it did.

17    Q.  Was one of those items that you were taught

18    about or instructed about the Ephedrine?

19    A.  Yes, sir.

20    Q.  And you are also familiar with the Illinois

21    Criminal Code?

22    A.  Yes, sir.

23    Q.  And did the Illinois Criminal Code list

24    Ephedrin for the precursor for methamphetamine; is that

1    county jail?

2    A.   Yes, sir.

3    Q.   That same day that the search warrant was

4    executed, December 30th, did you have occasion to be

5    involved with procuring of a second search warrant for a

6    residence here in Paxton?

7    A.   Yes, sir.

8    Q.   And that warrant was obtained that same

9    evening; correct?

10   A.   Yes, sir.

11   Q.   And were you, were you present when that --

12   what was your involvement with the execution of the

13   second search warrant?

14   A.   I helped secure the residence.

15   Q.   Did you observe any items in the residence?

16   A.   Yes, sir.

17   Q.   Could you describe some of the items that you

18   observed in the residence?

19   A.   Plastic bottles, tubing, gas masks, chemical

20   odor, strong odor.

21   Q.   And odor you already smelled in the other

22   residence?

23   A.   Yes, there was a strong ammonia smell in the

24   one at Paxton.

1    Q.   Who -- to you today, what agencies were
2    involved in executing the search warrant?
3        A.   Paxton Police, Gibson City Police, myself, and
4    I think Ford County was there.  I am not sure.
5        Q.   Based on your knowledge, training and
6    experience and what you observed is there an evening
7    this was consistent with the manufacture of
8    methamphetamine at that location also?
9            MR. KIRCHNER:  Same objection.
10           THE COURT:  What is the relevance of that to
11   the charges that on or about December 30th there was
12   possession of these items.
13           MR. LEE: I guess its --
14           THE COURT:  Sustained.
15       Q.   Any law enforcement officer obtain information
16   from Cynthia Blanding; is that correct?
17       A.   Repeat please.
18       Q.   The law -- were you present for some of the
19   discussions with the interviews with Cynthia Blanding;
20   is that correct?
21       A.   Yes, sir.  Could you summarize what information
22   she provided with respect to the Defendant being
23   involved with the manufacture of methamphetamine in this
24   area?

1          MR. KIRCHNER:  Hearsay, same object.
2   Hearsay foundation.

3          THE COURT:  Sustained.

4      Q.  Where was Cynthia Blanding interviewed?

5      A.  At the Ford County Sheriff's Office.

6      Q.  Were you present for all of the entered -- all

7   of the discussions with her, all of the interviews?

8      A.  No

9      Q.  For the portion that you were present, who else

10  was present and where did that take place?  Let's start

11  that.

12     A.  In the interview room.

13     Q.  Who was present?

14     A.  Chief Mutchmore and Chief Decker.

15     Q.  The portion of the interview that you were

16  present for, what information did she provide with

17  regard to the Defendant manufacturing methamphetamine?

18         MR. KIRCHNER:  Objection, foundation, hearsay.

19         THE COURT:  Overruled.

20     A.  She stated that two nights earlier, she had --

21         MR. KIRCHNER:  Objection, foundation.  She

22  still doesn't have any idea.

23         THE COURT:  We don't know when this discussion

24  was.  Sustained.  When was --

1    Q.  When did this discussion?

2    A.  Which discussion?

3    Q.  The discussion with planning the conversation

4    with Blanding?

5    A.  You mean the night of the search warrants, the

6    30th?

7    Q.  Do you recall an approximate time?

8    A.  It had to be around 8 o'clock I would guess;

9    7:30, 8:00.  I am not sure right now.  I have to refresh

10   my memory.

11   Q.  Was anyone else in the room when you were there

12   other than yourself, Mutchmore, Decker, and Cynthia

13   Blanding?

14   A.  No.

15   Q.  What did she say?

16   A.  She stated that she had been at the residence

17   at 218 here in Paxton on Orleans Street.  She stated she

18   arrived late at night, and she stayed in a downstairs

19   room while Marshall and a neighbor from across the alley

20   came and brought water over, and they went upstairs and

21   cooked methamphetamine.

22        MR. KIRCHNER:  Objection, foundation, hearsay.

23   We have no idea where she's when she claims to have any

24   information about anything, except she's downstairs at

1    some point.

2           THE COURT:  Sustained.  Additional foundation

3    as to how she knows what they were supposedly doing,

4    Mr. Lee?

5        Q.  What information did she -- what information

6    did she provide about -- did she provide information

7    about consuming methamphetamine?

8        A.  Yes, she did.

9           MR. KIRCHNER:  Objection, relevance,

10   foundation.

11          THE COURT:  Well -- Well, overruled.  The

12   foundational objection with respect to when, I mean, is

13   she talking about consuming methamphetamine allegedly on

14   that date?

15          MR. LEE:  If we get an opportunity to get to

16   that; I am getting a foundation objection for every

17   question here.

18          THE COURT:  Well, that's because we don't know

19   when we are talking about.

20          MR. LEE:  With respect to the evening that you

21   were just describing, the two days prior, that was

22   approximately the 28th; is that correct?

23       A.  28th.

24       Q.  So the search warrant is executed on the 30th.

1    your conversation with her, it is on the 30th, and in
2    describing events that occurred two nights before that;
3    was the 28th; is that correct?
4        A.   That's correct.
5        Q.   She described events there at the residence in
6    Paxton at 218; is that correct?
7        A.   Yes, sir.
8        Q.   Okay.  She described, she described the
9    individuals being present there were herself, Marshall
10   Blanchard, and a neighbor; is that correct?
11       A.   Yes.
12       Q.   Okay.  And she described her location was on
13   the main floor; is that correct?
14       A.   Yes, sir.
15       Q.   And what did she say -- what did she say took
16   place?
17       A.   She said that she stayed on the main floor
18   while Marshall and a neighbor from across the alley who
19   had brought water went upstairs and cooked meth.
20       MR. KIRCHNER:  Objection.  Move to strike
21   anything after went upstairs.  She is -- she already
22   said she stayed downstairs.
23       THE COURT:  Okay.  Well, let him lay
24   foundation.  What is it that she observed that leads

1    the defendant that they cooked methamphetamine.

2        Q.  What did she say happened next?

3        A.  After they were upstairs, they brought down

4    some meth, and they used the meth.

5        Q.  All three of the participants?

6        A.  Yes.

7        MR. KIRCHNER:  Objection, foundation and

8    hearsay.  We have no idea how she knows anything or when

9    they used it or where they used it.

10       THE COURT:  Well, no, they used something

11   apparently that evening.  The foundation objection is

12   how does she know what it was.  Sustained.

13       Q.  Did she describe any other -- anything else

14   indicating her familiarity with production of

15   methamphetamine?

16       A.  Not that I recall.

17       Q.  Who is the owner of the house in Paxton?

18       MR. KIRCHNER:  Objection, foundation, hearsay.

19       THE COURT:  Overruled.  I am not sure what

20   relevance it is.

21       A.  No.

22       Q.  Was the residence secured when yourself and the

23   other officer arrived to execute the Paxton search

24   warrant?

         A.  Yes, sir.

     Q.  Locked?

     A.  Yes, sir.

     Q.  With respect to items submitted to the lab from the execution of the Roberts search warrant, did those include coffee filters?

     A.  Yes, sir.

     Q.  Did some of those coffee filters subsequently test positive for the presence of methamphetamine?

         MR. KIRCHNER:  Objection, foundation.

         THE COURT:  Overruled.

     A.  Yes, sir.

     Q.  There were approximately 25 coffee filters obtained from the Robert residence; is that correct?

     A.  That's what I remember.

     Q.  Did any of those coffee filters have coffee in them?

     A.  None that I saw.

     Q.  Officer, there were a large, a large quantity, quantities of different materials submitted to the lab for analysis; is that correct?

     A.  Yes, sir.

     Q.  And you haven't gotten back all of the lab results; is that correct?

1       A.   That's correct.

2       Q.   So, at this point you, you don't know what

3  quantities of precursors you may have; is that correct:

4       A.   That's correct.

5       Q.   And that investigation continues; correct?

6       A.   Correct.

7            THE COURT:   Further inquiry, Mr. Lee?

8            MR. LEE:   No, Your Honor.

9            THE COURT:   Cross-examination.

10           MR. KIRCHNER:   Thank you, Your Honor.

11

12                       CROSS EXAMINATION

13                       BY MR. KIRCHNER:

14

15      Q.   Are you the Chief of Police for the Roberts

16  Police Department?

17      A.   Yes, sir.

18      Q.   How long have you held that position?

19      A.   Twelve years, 13.

20      Q.   How long have you known Marshall Blanchard?

21      A.   Since he moved to town.

22      Q.   When?

23      A.   Approximately about eight years.

24      Q.   When was the first time when you received any

1    information which caused you to initiate an

2    investigation or surveillance regarding Marshall

3    Blanchard during this six months preceding December of

4    2004?

5            MR. LEE:  Objection, relevance.

6            THE COURT:  Overruled.

7        A.  The first information I got was when Lori

8    brought it out to me.

9        Q.  So, December 29th?

10       A.  Yes, sir.

11       Q.  Of 2004?

12       A.  Yes, sir.

13       Q.  Now, you indicated you have known Lori

14   Blanchard for approximately eight years?

15       A.  The same amount of time as Marshall.

16       Q.  So, you know her to be the ex-wife of Marshall

17   Blanchard?

18       A.  Yes, sir.

19       Q.  Were you familiar with the circumstances

20   surrounding their dissolution of marriage and the nature

21   of their relationship and interaction since their

22   dissolution?

23            MR. LEE:  Objection.

24            THE COURT:  What's the relevance of that?

1            MR. MITCHELL:   Interest, bias, motive, a

2   person that he is relying on for hearsay information to

3   support probable cause.

4            THE COURT:   I will give a little latitude.

5   Overruled.

6       A.   Repeat the question please.

7       Q.   Were you familiar with the nature of the

8   relationship between Marshall Blanchard and Lori

9   Blanding and the circumstances surrounding their

10  dissolution?

11      A.   I really don't know how to answer this because

12  I don't know the circumstances surrounding their

13  divorce.

14      Q.   What's the nature of your relationship with

15  Lori Blanding?

16           MR. LEE:   Objection, interest, bias and motive.

17           THE COURT:   Overruled.

18      A.   Repeat the question please.

19      Q.   What is the nature of your relationship with

20  Lori Blanding?

21      A.   Same as with anybody else in town except she's

22  also on the Fire Department.

23      Q.   So, she works on the Fire Department with you?

24      A.   Yes, sir.

1    Q.    How long has that been true.

2    A.    Six years.

3    Q.    Do you have a social relationship with her?

4    A.    No, sir.

5    Q.    Is she currently married?

6    A.    You would have to ask her that.

7    Q.    Are you?

8    A.    Yes, sir.

9    Q.    Have you ever had --

10        MR. LEE: Your Honor, I am going to object to

11   that line of questioning.  What is this?

12        THE COURT:  Hold on.  Move on.  Sustained.

13        MR. KIRCHNER:

14   Q.    Have you had anything other than a professional

15   relationship with Lori Blanding?

16        MR. LEE:  Same objection.

17        THE COURT:  Overruled.

18   A.    No.

19   Q.    You said that your training with respect to

20   methamphetamine consists of a class at the Fire

21   Department?

22        A.    The Fire Department -- excuse me.  The Fire

23   Department put on, sponsored a training on

24   methamphetamine production and manufacturing because if

1    is now a big deal with methamphetamine manufacturing, and

2    firemen getting in the scenes that are not safe for them

3    to be.

4        Q.   My question was, is the extent of your

5    knowledge relating to methamphetamine manufacturing

6    related to and as a result of the class you had at the

7    Fire Department?

8        A.   Yes.

9        Q.   When was the class?

10       A.   Within the last six months.

11       Q.   When?

12       A.   I don't have the date.

13       Q.   What month?

14       A.   I don't have the month.  It's within the last

15   six months.

16       Q.   How long did the class last?

17           MR. LEE:   Objection.  Your Honor, this is

18   Preliminary Hearing.

19           THE COURT:  What's the relevance?

20           MR. KIRCHNER:  It goes to the weight that the

21   Court should attach to his assessment and his specific

22   testimony wherein he was asked about precursors based on

23   his knowledge from this class.

24           THE COURT:  Sustained.

1       Q.   Where are the various precursors to

2  methamphetamine?

3       A.   There are several.

4       Q.   What are they?

5       A.   I would have to look at them again.

6       Q.   Well --

7            MR. LEE:   Your Honor, again, this is a

8  Preliminary Hearing.

9            MR. KIRCHNER:   It still requires evidence,

10  Judge.

11           THE COURT:   Mr. Lee, he gets a little bit of

12  latitude.   If the witness doesn't recall off the top of

13  his head, he doesn't recall.   Next question.

14       Q.   What is the process for producing

15  methamphetamine?

16       A.   Well, you got to use a lot of Pseudophedrin

17  tablets.   You grind them up.   You use -- ammonia is used

18  in the process.   There is a chemical reaction that takes

19  place.   There is a drying process, a gassing out

20  process.

21       Q.   What type of tablets do you say are used?

22       A.   Pseudophedrin.

23       Q.   Is that the type of tablet that one would

24  purchase in a drugstore or grocery store?

A.  I could purchase it there.

Q.  And in fact, you submitted 13 empty medication blister packs and medication boxes for the Sheriff's Department, asking for prints in this case; did you not?

A.  No, sir.

Q.  You don't know anything about prints being requested?

A.  On blister packs?

Q.  Yes.

A.  That wasn't mine that was done, sir.

Q.  Was there a submission of 13 empty medication blister packs and empty medication boxes?

MR. LEE:  Objection, asked and answered.  He sustained this --

THE COURT:  What's the relevance?

MR. KIRCHNER:  If I could finish the question, Judge.

MR. KIRCHNER:  My client's prints are not on anything.

THE COURT:  Well, he said --

MR. LEE:  Anything --

THE COURT:  Wait, Mr. Lee.

MR. KIRCHNER:  He said it wasn't his case.

THE COURT:  Okay.  Well, all right.  Ask him it

1    he knew anything about it.

2        Q.   Isn't it true there were 13 empty medication

3    blister packs and ten medication boxes submitted for

4    prints, and Marshall Blanchard's prints were not on

5    those boxes of medication and blister packs?

6        A.   Was that done at the Roberts residence?

7        Q.   Can you answer my question?

8        A.   Not without further clarification.

9        Q.   Do you know anything about prints being

10   requested for medication blister packs and ten empty

11   medication boxes related to Marshall Blanchard?

12       A.   I am aware that there was some blister packs

13   found in the Paxton residence.

14       Q.   And they were submitted for prints?

15       A.   If you say so.

16       Q.   Well, have you seen the reports?

17       A.   No, sir.

18       Q.   Have you talked to Mr. Lee about the reports?

19       MR. LEE:   Your Honor, objection, he has

20   answered.

21       THE COURT:   Your objection is overruled.  The

22   question is:  Have you talked to him about these

23   reports.

24       A.   I heard him say that there was a print not

1   found on something.

2       Q.   Your Honor, may I approach the witness with an

3   exhibit?

4           THE COURT:   Well, what does he know?   He

5   doesn't know about it.   How is he going to --

6           MR. KIRCHNER:   I am going to ask if he has seen

7   the report.   I believe it is an evasive answer intended

8   to keep from the Court's consideration the fact that it

9   was specifically tested for his prints, Mr. Marshall

10  Blanchard's prints and the finding by the State Crime

11  Lab was they were not his prints.

12          THE COURT:   He says he doesn't know.   So how is

13  reading the exhibit going to provide him knowledge?

14          MR. KIRCHNER:   Hearsay is admissible.   I will

15  ask him about this report.

16          THE COURT:   Fine.   Mark the report.   This is

17  not a deposition, Mr. Kirchner.

18          MR. KIRCHNER:   I understand, Judge.

19          MR. LEE:   Your Honor, I am going to note an

20  objection.   We are now into a residence other than the

21  Roberts residence.

22          THE COURT:   But you asked him all kinds of

23  questions about --

24          MR. LEE:   Relevancy objections were sustained