E-FILED
Thursday, 15 September, 2005  03:44:50 PM
Clerk, U.S. District Court, ILCD

1   when I was trying to get into what was going on at the

2   Paxton residence.

3          THE COURT:  Relevancies were not sustained.

4   You asked a lot of questions about it.  There were some

5   foundational objections which were sustained.  You

6   started talking about the Paxton residence and you can

7   now ask him.

8          Q.  Showing you Defendant's Exhibit Number 1, do

9   you recognize that as a State Police Crime Lab Report

10  with respect to latent prints?

11         A.  I have never seen a State Police Crime Lab

12  Report with respect to latent prints.  I am waiting to

13  get one myself.

14         Q.  In twelve years as Chief of Police, you never

15  seen a State Crime Lab Report relating to prints?

16         A.  That's correct.

17         Q.  Do you know what the State Police Criminal Lab

18  Reports look like?

19         MR. LEE:  Why should there be any other

20  questions with regard to this?  He said he hasn't seen

21  this one.  He hasn't seen any of them.  What is the

22  relevance of this?

23         THE COURT:  Is there an objection?

24         MR. LEE:  Yes, relevance.

1          THE COURT:  He.  It is irrelevant.  He, anyway,

2     he hasn't seen them.  So, how are you going to

3     authenticate this one?

4          Q.  Have you seen any?

5          A.  He --

6          THE COURT:  He said he hadn't seen any related

7     to crime lab reports.

8          Q.  Had you seen any State Crime Lab Reports?

9          A.  Yes, sir.

10         Q.  Do you recognize that as being a form of a

11    State Crime Lab Report?

12         A.  Yes, it appears to be, sir.

13         Q.  Does that report indicate that there was a

14    submission of methamphetamine?

15         MR. LEE:  Objection.  Is he just going to sit

16    here and read the report now through this witness who

17    isn't familiar with and hasn't seen it?

18         MR. KIRCHNER:  Judge, there are lots of

19    questions about things taken from the house.

20         THE COURT:  So the objection is overruled.

21         MR. LEE:  Why don't we submit the document,

22    instead of going through this fiasco with this witness.

23         THE COURT:  Have a seat, Mr. Lee.  Your

24    objection is overruled.

1              MR. KIRCHNER:  Does this report.

2              THE COURT:  All right.  Without belaboring

3    this, hand me the report.  The report says there is no

4    latent prints.  Right.

5              MR. KIRCHNER:  No, it says there are prints

6    suitable for comparison and they are not Blanchard's.

7              MR. LEE:  A single print.

8              MR. KIRCHNER:  That's correct.

9              MR. LEE:  Which didn't match up.  As long as we

10   are reading from the report.

11             THE COURT:  Mr. Lee, Mr. Lee.  I am having a

12   conversation with Mr. Kirchner, not you.  All right.

13   The report says that they are not Mr. Blanchard's

14   prints.  Does the State dispute that?  No.  Proceed.

15             THE COURT:  You indicated that a search warrant

16   was executed on 12/29.  It was executed on 12/30.

17        Q.   Was it obtained on 12/29?

18        A.   Excuse me, repeat, sir.

19        Q.   It was obtained 12/29?

20        A.   Yes.

21        Q.   And executed on 12/30 at what address?

22        A.   At 215 North Main.

23        Q.   And you said that you were present during the

24   execution of that search warrant?

1    A.  Yes, sir.

2    Q.  How was entrance to the house gained?

3    A.  By the Illinois State Police TRT.

4    Q.  How did they get into the house?

5    MR. LEE:  Objection, objection, relevance.

6    THE COURT:  What's the relevance of this?

7    MR. KIRCHNER:  Well, there were questions about

8 property and things being secured.

9    MR. LEE:  In Paxton.

10    THE COURT:  Mr. Lee, no, I heard testimony

11 about the Roberts residence.  What is the relevance for

12 probable cause?  This is not a motion to quash.

13    MR. KIRCHNER:  I understand.

14    THE COURT:  The results of any search warrant,

15 and it is not a discovery deposition in anticipation of

16 that.  Sustained.  It is not relevant.

17    Q.  Was any witness present in the house?

18    A.  Inside the house, no, sir.

19    Q.  You said Cynthia Blanding was taken into

20 custody?

21    A.  Yes, sir.

22    Q.  Where was she?

23    A.  She was outside the residence.

24    Q.  Where outside the residence?

1        A.   When I saw her, she was between her car and the
2   house.
3        Q.   What was she taken into custody for?
4             THE COURT:   Well, what's the relevance?
5             MR. KIRCHNER:   Well, if they arrested Cynthia
6   Blanding at the residence in connection with anything
7   inside the residence, I think, it certainly goes to
8   whether or not there is probable cause to believe that
9   my client committed any offense at all.
10            THE COURT:   Maybe.   You may answer.
11       A.   Repeat the question.
12       Q.   What was Cynthia Blanding arrested for?
13       A.   She had weed on her.
14       Q.   That's what she was arrested for?
15       A.   Yes, sir.
16       Q.   Why was she searched?
17       A.   Because she was on the scene the State Police
18   have protocol.
19       Q.   Where was she on the scene?
20       A.   Outside the residence.
21       Q.   Where?
22            MR. LEE:   Asked and answered.
23            THE COURT:   It's been asked and answered.
24   Where are we going now?

1          Mr. Kirchner, I am sure this is all

2    interesting, and you are glad to know it.  What does

3    this have to do with probable cause?

4          MR. KIRCHNER:  They apparently arrested a woman

5    on the scene.

6          THE COURT:  He said where she was between the

7    car and the house, and he said what she was arrested

8    for.  I assume by weed he meant cannabis.  Next

9    question.

10        Q.  Where was the car parked?

11        A.  On the south side of the house.

12        Q.  And what was located in the car?

13        MR. LEE:  What's the relevance?

14        MR. KIRCHNER:  Again,  Judge, this goes to

15   whether there is probable cause for charges against my

16   client.

17        THE COURT:  He told you what she was arrested

18   for.

19        Q.  Was the car searched?

20        MR. LEE:  Objection.

21        THE COURT:  Overruled.  You can answer.  Was

22   the car searched?

23        A.  Not then.

24        Q.  How much later?

1    A.    That evening pursuant to a search warrant.

2    Q.    What was found inside the vehicle?

3    A.    Found inside the vehicle was purported to be

4    Marshall's clothes inside the bag and a plastic bottle

5    containing individually packaged quantities of a white

6    powdery substance and a wrap of tin foil with numerous

7    packages of a white powdery substance.

8    Q.    Whose vehicle was it?

9    A.    Cynthia Blanding's.

10    Q.    Inside the residence, were there any

11    indications of anyone having slept or lived there;

12    clothing, furnishings, mattress, anything of that type?

13    MR. LEE:    Which residence?    Objection,

14    foundation.

15    Q.    Inside the residence that you executed a search

16    warrant on December 30th?

17    MR. LEE:    There were two search warrants.

18    THE COURT:    Wait.    He said the date.    If the

19    witness doesn't understand, he will tell us.

20    A.    Which residence are you referring to?

21    Q.    I believe you said the first search warrant was

22    executed at 210 North Main?

23    A.    Yes, sir.

24    Q.    Did you not?

1    A.  Yes, sir.

2    Q.  What did you find inside the house with respect

3  to furnishings?

4    A.  The State Police after a tactical response team

5  had secured the residence, a certified team from LaSalle

6  Task Force, they proceeded inside, and they allowed us

7  in.  They did the search, and they conducted the search.

8  They bagged and tagged everything and brought it out to

9  me.

10    Q.  What furnishings were inside the residence?

11    A.  When I got in, I saw -- after the search was

12  done -- the usual furnishings of the house.

13    Q.  Like what?

14    A.  Bed, couch, chair.

15    Q.  Who lived there?

16    A.  Marshall Blanchard.

17    Q.  Marshall Blanchard lived there?

18    A.  Yes, he did.

19    Q.  Who else lived there?

20    A.  Marshall, Jr.

21    Q.  Who else?

22    A.  The daughter stayed there off and on.

23    Q.  Did you obtain any information as to why

24  Cynthia Blanding was outside the residence?

1    A.    Judi, what she said, she was leaving.

2    Q.    Where is Cynthia Blanding at now?

3    A.    I don't know.

4    Q.    You don't know?

5    A.    No, I don't.

6    Q.    Do you have any information as to where she is?

7    A.    I don't know.

8          MR. LEE:  Asked and answered.

9    Q.    Are there any pending charges against Cynthia

10   Blanding?

11         MR. LEE:  Objection, relevance, interest and

12   bias.

13         THE COURT:  He may answer if he knows.

14   A.    You would have to ask somebody else besides me.

15   I don't know.

16   Q.    You have not been made aware of any charges in

17   Vermillion County against Cynthia Blanding or Iroquois

18   County against Cynthia Blanding?

19   A.    No, I haven't.

20   Q.    Have you not spoken to Mr. Lee about those

21   charges?

22   A.    No, I haven't.

23   Q.    Or anyone else?

24   A.    No, I haven't.

1       Q.   Were you aware of any promises made to you...

2  Blanding in exchange for what you claim she told you?

3       A.   There were none when I was present.

4       Q.   Was there any suggestion about what would

5  happen to Ms. Blanding if she didn't cooperate?

6       A.   No, sir.

7       Q.   By anyone?

8       A.   Not at all.

9            MR. LEE:   Objection, beyond the information and

10 knowledge; he may answer when he was there if he knows.

11      Q.   Are you aware of any correspondence from

12 Mr. Lee to Cynthia Blanding?

13      A.   No, sir.

14      Q.   Are you aware of any promises made or comments

15 made to Cynthia Blanding about whether she will retain

16 parental rights for her children by cooperating with

17 them?

18      A.   No, sir.

19      Q.   And you never heard it?

20      A.   No, sir.

21      Q.   You said you participated in interviews with

22 Cynthia Blanding; how many interviews?

23      A.   Repeat please.

24      Q.   You said that you participated in interviews

1   with Cynthia Brumally.  How many interviews have you
2   participated in?

3       A.  Two.

4       Q.  You told us, about one on December 30.  When
5   was the next one?

6       A.  I road along with Chief Decker to Hoopeston.

7       Q.  When was that?

8       A.  I don't know.  You would have to get his
9   report.

10      Q.  How long ago was it?

11      A.  Within the last month.

12      Q.  And you can remember it was in February; was it
13  in March?

14      A.  I have had a lot of personal things going on.
15  No, I could not.

16      Q.  You seem to remember a lot about the things
17  that Mr. Lee asked you about?

18          MR. LEE:  Objection.

19          MR. KIRCHNER:  I will withdraw the question.

20          THE COURT:  Thank you.  Proceed.

21      Q.  Who was present other than you and Chief Decker
22  for this interview that happened sometime in the last
23  month.

24          MR. LEE:  Objection, relevance.  This is not

```
 1   back to a discovery deposition.

 2            THE COURT:  Overruled.

 3            MR. LEE:  We are beyond anything talked about.

 4            THE COURT:  Overruled.  We know exactly when

 5   this conversation was.

 6       Q.  Who was present?

 7       A.  Chief Decker and myself and before it was

 8   finished somebody from the Hoopeston Police Department.

 9       Q.  Was she under arrest at that time?

10       A.  No, sir.

11       Q.  Why was she at the Hoopseton Police Department?

12       A.  To be interviewed.

13       Q.  For what?

14       A.  Chief Decker wanted to talk to her.

15       Q.  For what?

16       A.  Ask him.

17       Q.  Were you there?  What did they talk about?

18            MR. LEE:  Objection, relevance.

19            THE COURT:  What is the relevance to the

20   Preliminary Hearing?

21            MR. KIRCHNER:  I don't know what his answer is.

22   But if his answer goes to interest, bias, or motive, I

23   am entitled to ask the question.

24            MR. LEE:  That is something that happened in
```

1    Vermillion County, Hoopeston, other agencies.

2         THE COURT:  Overruled.  You can tell us what

3    you recall about the interview.

4         A.  I don't recall anything about the interview

5    except I was there.  I did not take notes.  I did not

6    make a record of it.  It was Chief Decker's interview,

7    and I rode along with Chief Decker that day.

8         Q.  Why were you there?

9         MR. LEE:  Objection, relevance.

10        THE COURT:  Sustained.  He said he just rode

11   along, and he says he didn't recall anything that

12   happened.

13        THE COURT:  Next question.

14        MR. KIRCHNER:  I have no other questions.

15        THE COURT:  Redirect.

16        MR. LEE:  Nothing further.

17        THE COURT:  You may step down.  Further

18   evidence?

19        MR. LEE:  Nothing further.

20        THE COURT:  Any evidence for the Defendant?

21        MR. KIRCHNER:  No.

22        THE COURT:  Argument?

23        MR. LEE:  Your Honor, I am going to first

24   address the additional charge.  What I am going t.

1  request at this time I hope to amend 05CR, to

2  parallel the Count IV for manufacture of a controlled

3  substance.  That would be our amended Information.  It

4  would be our Amended Information Count I.  The only

5  difference between the two is the quantity.  I -- excuse

6  me.  I take that back.

7          The only difference is the date.  Maybe amended

8  Count I which alleges on December the 30th, and 05CR,

9  alleges December the 28th; I submit that we have

10  introduced evidence with regard to manufacturing

11  occurring on the 28th.

12          However, at the time this was filed January the

13  10th, we did not have the lab report back which stated

14  that the amount of methamphetamine obtained in execution

15  of Search Warrant Number 1 exceeded the statutory amount

16  for that classification.

17          MR. KIRCHNER:  Your Honor, I have no idea what

18  is going on here or what Mr. Lee is requesting, but I

19  object to the amendment of the charge alleging a felony.

20  Unless we are going to follow protocol and have an

21  arraignment and a Preliminary Hearing, I object to

22  answering a charge after a Preliminary Hearing to allege

23  a different date and a different defense, and I would

24  object to counsel seeking to amend by representations of

the Court: information which was made known to

THE COURT:  Well, Mr. Lee, if you can clarify
for the Court please.

MR. LEE:  Perhaps.

THE COURT:  I will tell you what my question
is, and then you can tell me what the clarification is.
All right.  In 04 CF 120, we have filed on January 10, a
Count III alleging unlawful possession of weapons by a
felon on December 30th, and we have Count IV alleging
possession of methamphetamine manufacturing chemicals on
December 30th and manufacture 15 grams or more of
methamphetamine.  We have amended -- that was Count IV
was filed on January 19.  Also on January 19, we have
Amended Count 1, alleging unlawful manufacture on the
30th day of December of more than 15 grams and less than
100 grams of methamphetamine, and Amended Count II
alleging unlawful possession of more than 15 grams but
less than 100 grams.  All of that on December 30th.

Now, on January 10th, there was also filed in 05 CF
5 an Information alleging that on December 28th the
offense of unlawful manufacture of a controlled
substance was committed, less than 15 grams of
methamphetamine.

Now, you want to amend the one count in 05 CF 5

1    to allege what..

2         MR. LEE:  To allege the amount manufactured was

3    more than 15 but less than 100 grams, Your Honor.

4         THE COURT:  All right.  Now, Mr. Kirchner, you

5    are objecting to the amendment of 05 CF 5 to allege more

6    than 15 but less than a hundred grams on the 28th?

7         MR. KIRCHNER:  Correct.

8         THE COURT:  All right.  And you are objecting

9    to the amendment of Count IV to allege 15 grams or more

10   but less than a hundred instead of less than 30 on the

11   30th?

12        MR. KIRCHNER:  Correct.

13        THE COURT:  All right.  And the basis for your

14   objection is?

15        MR. KIRCHNER:  Well, I don't think the evidence

16   supports probable cause for either of them, but leaving

17   that aside for the moment, we have a Preliminary Hearing

18   to which my client is entitled.

19        We apparently have some notion that in a

20   criminal case at a Preliminary Hearing, you amend the

21   Informations charged under oath to conform with the

22   pleadings and the proof somehow, and perhaps, analogous

23   to some civil procedure rule, post-judgment amendments

24   permitted by the Court.

1    I don't believe it is appropriate and the law

2 to permit the amendments at all, and the evidence

3 doesn't support probable cause for either one.

4    THE COURT:  All right.  I am going to allow the

5 amendments over your objection, and I will hear argument

6 on probable cause.  Mr. Lee.

7    MR. LEE:  What the genesis of this was not

8 observations made by some law enforcement officer, but

9 by the Defendant's son, residing there with the

10 Defendant, observing unusual odors, chemical odors,

11 observing bottles, and being concerned enough to take

12 photographs of those items and actually obtain a sample

13 of one of those, one of those items.

14    These were tendered to his mother, who tendered

15 them to the police officer.  The observations lead to

16 the items being tested, and it tested positive for the

17 presence of Ephedrine, a precursor to the manufacture of

18 methamphetamine.

19    On the basis of those observations, the initial

20 search warrant was obtained, and as a result that search

21 warrant, well, in excess of the statutory amount, well

22 in excess of 15 grams of methamphetamine was obtained at

23 the residence of Marshall Blanchard.

24    No one else was present at the residence.

1  Observed outside the residence was Ms. Branning.

2      Where did I hear the -- all I heard was testimony

3  that one report came back from the Illinois State Police

4  that there was a substance containing more than 15 grams

5  of methamphetamine well in excess.

6      Well, Mr. Kirchner introduced exhibits and

7  perhaps, we should have introduced -- it seems like that

8  would be more appropriate at trial rather than the

9  Preliminary Hearing.

10      THE COURT:  I am talking about the testimony I

11  have heard at the Preliminary Hearing.  Okay.  Proceed.

12      MR. LEE:  Well, it's in excess of 15 grams; the

13  reasons for the request are to the amendment of the

14  charges, Your Honor, is that the evidence developed

15  subsequent to that, the search of the home in Paxton

16  indicating that there was another methamphetamine lab at

17  a residence unoccupied, owned by the Defendant in a

18  residence, and more methamphetamine manufacturing items

19  that he located within that residence, and the evidence

20  that our investigation develops is that there was a cook

21  or a manufacture two days prior which would be on or

22  about the 28th.

23      That the reason for our request for amending the

24  separate charge, if the evidence appears more

1   indicative, that th manufacturing was and

2   as opposed to the 40th when the search warrants were

3   executed.  With regard to the counts of possession of a

4   precursor, those, the officer has testified about

5   obtaining a large number of containers and a large

6   number of items and submitted to the labs, and we don't

7   have the -- we don't have the results back; whether

8   those, in fact, will test out to be precursors, but I

9   submit that given all the circumstances, the discovery

10  of the meth manufacturing items at both locations, the

11  discovery of the meth, itself, and the testimony of the

12  Officer that the item obtained by Marshall Blanchard's

13  son tested positive for Ephedrine.

14      I submit those are sufficient for probable cause

15  purposes to establish the charges with respect to

16  methamphetamine precursor.

17          THE COURT:  All right.  Just a second.  All

18  right.

19          Mr. Lee, it was Count IV of 04 CF 120; right?

20  And if so, No. 5 CF 5, these are the ones we need to

21  make an amendment to?

22          MR. LEE:  Your Honor, if I could review the

23  statute one more time before - I want to make certain

24  --

1          THE COURT:  I am confirming those at... ...
2    you wanted.
3          MR. LEE:  Correct.
4          THE COURT:  Have a seat.  Mr. Kirchner's time
5    to argue.
6          MR. KIRCHNER:  May it please the Court and
7    counsel.
8          MR. LEE:  Counsel.
9          MR. KIRCHNER:  Your Honor, I fully recognize
10   that a Preliminary Hearing is a probable cause
11   determination, and I fully recognize that the law is
12   that probable cause is a fairly low threshold, but it is
13   a threshold.
14          You cannot just file charges without having
15   evidence to a probable cause finding when those are
16   felonies.  That's what he has alleged in this case.
17   Now, perhaps, the best indication of what has really
18   happened here is both his evidence, both in Mr. Lee's
19   argument and in the other evidence, where the requests
20   were asked about items being taken from the residence,
21   submitted, and the evidence, the testimony, and
22   Mr. Lee's argument was that we don't have information
23   back.
24          We are still investigating, and yet, from that

1  Mr. Lee makes the step to say that somehow there ...
2  materials associated with the production of
3  methamphetamine.  The appropriate way in which to have
4  handled this, and to have handled this, which is also
5  reflective of the lack of probable cause, is for the law
6  enforcement agencies and officer involved to have done
7  the investigation before charges were filed to determine
8  whether there was probable cause to be able to present
9  it to the Court at a Preliminary Hearing.  Not to come
10 into Court and say, Judge, we want you to assume that
11 the evidence which we can't produce and don't have
12 information about even in the lab would support these
13 charges, and that's what they have done.
14         They have asked you to assume something about
15 materials that were submitted and containers that were
16 submitted and objects which were ceased and submitted
17 and assumes somehow that they -- there wasn't even a
18 good description of any of the objects that they talk
19 about tanks and/or bottles or -- are they talking about
20 anything?
21         No, they just sat there with a bunch of stuff
22 taken from the house.  Mr. Lee says this case started,
23 and it maybe a very good argument before a jury, but it
24 has nothing to do with probable cause.  If he says that

1    case was started when his son took photographs and took

2    a bottle to his mother, who is the ex-wife of my client,

3    I don't believe -- my notes don't reflect.

4           If I am wrong, I am wrong, but there was no

5    indication as to when the photographs were taken, what

6    they were taken of, what was depicted in the

7    photographs, where the bottle was removed from, and when

8    the bottle was obtained.  There was some evidence about

9    whether it was given to Lori Blanding.

10          There was some evidence about Lori Blanding

11    making a phone call, but when were these photographs

12    taken a year earlier, two months earlier?  Probable

13    cause does require some threshold.

14          The testimony then continued by eliciting a

15    statement that there was a chemical odor in the house.

16    There was no identification of the house at issue.

17    Never a follow-up question as to what house they were

18    referring to.  We have an officer here who has been

19    Chief of Police for twelve years, who claims to have

20    determine detailed information, which the State wants to

21    rely upon to support probable cause, but he can't

22    remember anything about his training, can't remember

23    when the last one occurred but sometime in the last six

24    months and can't remember even what month it was and

1  can't remember what precursors he learned about, but
2  Mr. Lee wants to rely upon him for some expert opinion
3  to support probable cause.

4     His lack of ability to remember anything about
5  anything relevant; the charges certainly reflects on
6  whether there is probable cause.  Then the Court is told
7  that Cynthia Blanding is arrested outside of the
8  residence.  In the area somewhere and she had -, she had
9  weed on her.  We don't know why she was stopped.  We
10  know that she had items in her vehicle.  We know that
11  there were others in the residence, in the household
12  because the Court heard evidence about that, and again,
13  this is not just a question of whether there is some
14  evidence, some evidence, not even probable cause, maybe
15  a scintilla, some evidence of some criminal activity.
16  The issue in this case is:  Is there probable cause to
17  believe, one, that a crime which has been alleged was
18  committed, and two, that my client committed it.

19     This isn't about charging his son with possession
20  of anything, and this isn't about charging any other
21  occupants of the household with anything.  This is about
22  charging Marshall Blanchard, and so, the Court has to
23  ask what evidence is there that my client was involved
24  in any of the allegations which are being made against

1  him on either of these two days.

2      Is there any indication that he was under

3  surveillance, observations, any indication he made

4  statements, any indication he was involved in the

5  production or manufacturing of methamphetamine?

6      The closest that he came to talking about Marshall

7  Blanding, the closest that they came was when the

8  Officer was asked what Cynthia Blanding told him during

9  an interview, and I would also suggest to the Court that

10  a police officer who is the Chief of Police and has had

11  experience for twelve years, who tells this Court that

12  he goes with Chief Deputy to an interview in Hoopeston

13  to interview the primary witness in this case, Cynthia

14  Blanding, but doesn't remember why he went with Chief

15  Decker or what they talked about, again reflects on

16  credibility and interest, motive and bias.

17      The threshold is not high for probable cause, but

18  there is a threshold.  The closest that they came to

19  involving my client in any way was when he was allowed

20  to testify that Blanding said that my client and another

21  person went upstairs.  She stayed on the main floor.

22  They were never able to identify in any way whatsoever

23  what they claim my client did upstairs.

24      Now, this information about my client being

1  allegedly being upstairs while Cynthia Blanding was

2  downstairs, if the court rules, was claimed to be given

3  to them in an interview of Cynthia Blanding; if, in

4  fact, they interviewed Cynthia Blanding, and, in fact,

5  she told them she had waited downstairs while Marshall

6  Blanchard and someone else went upstairs.

7      Is there any doubt that the Chief of Police for

8  twelve years and Chief Decker and others could not have

9  asked her, well, what did you notice; what did you see;

10 what did you observe, and repeated that to the Court

11 today to establish probable cause?  There is no

12 information about what she observed, smelled, saw,

13 anything.  There is not even --

14      THE COURT:  I was tempted to ask the question.

15 But I knew you wouldn't be too happy with my doing that,

16 Mr. Kirchner.  I was attempting to ask a question.

17 Well, when the State was trying to illicit the fact that

18 they apparently cooked meth upstairs and then came down

19 and did some meth at the Paxton house, what did she say

20 that the Defendant said they were doing when they came

21 downstairs; what did he say the substance was?  But that

22 question wasn't asked, and I didn't think it was

23 appropriate for me to ask it.  Anything further?

24      MR. KIRCHNER:  No, Judge.

1          THE COURT.  All right.  Well, let's ... we

2    can do the easiest first; the Count III of 04 CF 120

3    alleges unlawful possession of weapons by a felon.

4    Based on the evidence that the residence was

5    Mr. Blanchard's, there were multiple weapons and that he

6    is a convicted felon, there is probable cause on that

7    Count III.

8          Now, with respect to Count IV of 04 CF 120, the

9    allegation is that on December 30th the Defendant

10   possessed the methamphetamine manufactured chemicals,

11   namely, Ephedrine and Psuedoephedrine with intent to

12   manufacture 15 grams or more but less than 100 as

13   amended.  You are objecting to that amendment, but I

14   don't think it makes a lot of difference whether it says

15   30 or whether it says 100.  That's not a particularly

16   substantive amendment.  It just changes the particular

17   class.

18         And Mr. Lee, does that take it to a Class X as

19   opposed to a Class I?  In any case, the evidence of

20   probable cause with respect to that is that in the

21   execution of the search warrant at Mr. Blanchard's

22   house on the 30th, there were items taken and amongst

23   those items were something that was sent to the crime

24   lab which was a report that there was more than 15 grams

1  of a substance containing methamphetamine.

2      We don't know what the weight was or, at least,

3  there is no testimony as to that.  In addition, there is

4  evidence that the son had told his mother that things

5  were not right at the house where he resided with his

6  father, and there is a strong odor in the home, and that

7  he had taken some photos and gave the disk and the bag

8  full of powder to his mother.  The bag which tested

9  positive for Ephedrine and a field test apparently.

10      You are correct; there is no specific time frame,

11  but it appears at least inferentially to be somewhere

12  contemporaneous with the delivery of these items on or

13  about December 29th to the Officer.

14      Mr. Lee, the count amended Count II which alleges

15  on December 30th unlawful possession of more than 15 but

16  less than 100 grams of methamphetamine is purported to

17  be a Class 1 felonY.  That's why I assume the possession

18  of methamphetamine chemicals of Ephedrine and

19  Psuedoephedrine 15 grams of but less than 100 grams

20  can't be anymore than a Class 1 felony; is there?

21      MR. LEE:  There does not appear to be a higher

22  class.

23      THE COURT:  Probable cause for Count IV,

24  amended Count II, but you are correct, Mr. Kirchner.  I

is certainly not overwhelming, but there is minimal probable cause. With respect to the amended Count 1 of 04 CF 120 alleging unlawful manufacture of a controlled substance, methamphetamine, and with respect to the information in 05 CF 5, alleging unlawful manufacture of a controlled substance on the 28th, I don't know how I am to conclude that there is probable cause based on this evidence that Mr. Blanchard is the one that manufactured the alleged substance.

There is probable cause that he might have been in possession of those quantities, but I don't know how I am to conclude simply because there is probable cause to believe there is some sort of drug activity in his residence, that he is the one that manufactured it. When I heard, at least, three or two or more other people, apparently, Ms. Blanding had some sort of connection with the Roberts address; apparently the son had some sort of contact with the Roberts address, and apparently there is testimony about the daughter frequenting the Roberts address.

As far as the testimony of Blanding about something taking place two days before the 30th at the Orleans Street address in Paxton, there is no testimony about her describing what allegedly took place. An

1  there is the conclusion apparently that she told us
2  they were cooking meth, but no evidence as to how she
3  knows it was or was not.  Not even any evidence as to
4  how she knows they apparently consumed meth, and
5  absolutely no description as to what the process was.

6      The Officer testified that there was a strong odor
7  of or smell of ammonia when he was there on the 30th,
8  but that doesn't provide probable cause that somehow
9  Marshall Blanchard was manufacturing there on the 28th;
10 no probable cause as to the manufacturing charges.
11 Probable cause on the remaining, Mr. Blanchard's amended
12 Count II and Count IV of 04 CF 120, alleging possession
13 of methamphetamine more than 15 grams but less than 100
14 and possession of methamphetamine manufacturing
15 chemicals namely Ephedrine and Psuedoephedrine, more
16 than 15 and less than 100 grams.

17     Each of those are Class I felonies punishable
18 by between four and 15 years in the Department of
19 Corrections.  Is there any basis for extended term based
20 on his prior felony record, Mr. Lee?

21     MR. LEE:  No.

22     THE COURT:  All right.  Up to a $25,000 fine or
23 both, mandatory $1,000 assessment, drug assessment and
24 drug fines which could be up to $250,000.

1          The Court in unlawful possession of a weapon, a
2   a felon is a Class 3 felony, two to five years
3   Department of Corrections up to a $25,000 fine or both.
4          Any questions about the charges or the possible
5   penalties, Mr. Blanchard?
6          THE DEFENDANT:  No.
7          THE COURT:  Plea of not guilty and jury demand,
8   Mr. Kirchner?
9          MR. KIRCHNER:  Yes, Your Honor.
10          THE COURT:  All right.  Since the parties are
11   already aware this case is on my docket as presiding
12   judge.  Mr. Lee, the lab situation being what it is, is
13   this case to be on the May or August calendar?
14          MR. LEE:  I think it would be safe to be put on
15   the August jury calendar, and we have a Grand Jury
16   convene, a Grand Jury too.
17          THE COURT:  The State's request is on the
18   August jury calendar.  August 15, 2005, commencement of
19   that jury calendar.  Mr. Blanchard, the docket call for
20   that calendar, Mr. Kirchner, is July 26th, at 1:30 p.m.
21   If the State is seeking some additional charges, I guess
22   we will be in Court between now and then.  I will enter
23   a standard discovery order in this case.
24          Mr. Blanchard, I need to admonish you because

1    there was some time interval between when the arrest

2    warrants were issued in this case and when you first

3    appeared.  You can be tried in your absence.  That if

4    you do not voluntarily appear for trial in August, the

5    case can go on in your absence, and you can be tried,

6    convicted and sentenced in your absence.

7          Mr. Kirchner would be at some disadvantage

8    defending an empty chair when you are not here.  More

9    importantly, if you are not here, you won't be here to

10   give him your authorities about selecting jurors, and

11   you won't be here to assist him in a question you might

12   want to ask of the State's witnesses, when you could

13   have an opportunity to cross-examine them with his help.

14   You won't be here to hear what the evidence is and

15   witnesses you might want to present, including the right

16   to subpoena people who might be reluctant to come and

17   help, and most importantly, you won't be here to decide

18   whether you want to testify or remain silent, which is

19   your choice.  And no one can force you to or prevent you

20   from testifying.

21          If you voluntarily absence yourself from trial

22   and don't show up, the case goes on without you.  You

23   give up your rights, and you can be tried, convicted and

24   sentenced in your absence, which means, if you don't

1    show up, the next time you see somebody they are going

2    to be in uniform and they are not coming to bring you

3    back for trial.  They are coming to take you to prison.

4    Do you understand the importance of appearing here?

5            THE DEFENDANT:  Oh, I will be here.

6            THE COURT:  Anything further, Mr. Kirchner?

7            MR. KIRCHNER:  Yes, Judge.  If I may, I want to

8    make sure that my client is clear, and I am clear.  The

9    charges which remain are the weapons charge, and what

10   was labeled amended information Count II relating to

11   possession on December 30, and a Count III which doesn't

12   say amended relating to possession on December 30th.

13           THE COURT:  Yes.  Except Count III is the

14   weapons charge.  Count III is weapons charge and

15   December 30th Count IV is the possession of

16   methamphetamine manufactured chemicals on the 30th and

17   amended Count II an unlawful possession of a controlled

18   substance, namely, methamphetamine on December 30th.

19           MR. KIRCHNER:  And Count IV is as amended over

20   my objection; is that correct?

21           THE COURT:  That is correct.

22           MR. KIRCHNER:  Okay.

23           THE COURT:  So it reads more than 15 grams but

24   less than 100 grams.

1         MR. KIRCHNER: And the last question I have, I

2 believe that 05 CF 5 or there was a finding of no

3 probable cause.

4         THE COURT: No probable cause.

5         MR. KIRCHNER: If there was bond posted in that

6 case, can the Court order that be released to my client?

7         THE COURT: If it was, I would apply it to the

8 remaining case, but there wasn't. There is no bond

9 posted in the 05.

10         MR. KIRCHNER: And the Court referred to a

11 standard discovery order. May I have a copy of that?

12         THE COURT: You will get that.

13         MR. LEE: With respect to that standard

14 discovery order, I would like it to be accelerated with

15 respect to the Defendant's compliance. We have fully

16 complied with Preliminary Hearing with all the

17 discovery. I made a full disclosure of witnesses. I

18 would like, I would like that order to be accelerated

19 with respect to the Defendant's clients, given we have

20 complied with discovery before the Preliminary Hearing,

21 and I will be conferring with the Court to schedule a

22 Grand Jury as soon as possible.

23         MR. KIRCHNER: Your Honor, I would object to

24 modification of that order. It is correct that we have

1    received some discovery.  I can represent to the court,

2    and I suspect Mr. Lee is not surprised by this, there is

3    voluminous material, which I intend to request including

4    specific information about Cynthia Blanding.  All we

5    been told is that the State is somehow aware of charges

6    in Iroquois and Vermillion County against her.  We been

7    provided with no identification of the nature of the

8    charges, the case numbers, what promises have been made

9    to her.  We have -- so there is --

10           THE COURT:  I will enter the standard discovery

11   order.  The case is on the August jury calendar.  That

12   will give the parties plenty of time to comply with

13   discovery.  All right.  That will complete the record.

14           (Court Adjourned.)

15

16

17

18

19

20

21

22

23

24

```
 1        STATE OF ILLINOIS )

 2        COUNTY OF FORD

 3

 4             OFFICIAL COURT REPORTER'S CERTIFICATE

 5

 6        I, DEBORAH L. IZATT, an Official Court Reporter in

 7   and for the 11th Judicial Circuit of the State of

 8   Illinois, and the Official Court Reporter who reported

 9   the proceedings had in this case as set forth in this

10   certificate.

11        I do hereby certify that the foregoing transcript

12   of the proceedings had in this case is a true and

13   accurate transcript.

14        Dated this ____ day of

15   March ____ 2005.

16   _____

17   Deborah L. Izatt, CSR

18   Official Court Reporter

19   Eleventh Judicial Circuit

20   State of Illinois

21   #084-002429

22

23

24
```